IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| ALPHONZA CARL KIRKSEY<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY<br>600 5TH ST., NW<br>Washington, DC 20001<br>Defendant. | ) | Civil Action No.: |

**COMPLAINT**

(Race, Ethnicity and National Origin Discrimination and Reprisal in Employment)

1. This is a case of national origin, race and ethnic discrimination and retaliation in the denial of promotions to a well-qualified and long-tenured employee of the Washington Area Transit Authority (WMATA). In late 2021 and 2022 a cadre of WMATA high-level managers of Caribbean descent bypassed Alphonza Carl Kirksey for jobs to which he was superbly qualified, and merited selection. These denials were to favor other applicants of Caribbean descent who ultimately were awarded the positions. This scheme violated Title VII of the Civil Rights Act of 1964.

2. Kirksey raised internal complaints of discrimination and then ultimately filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). These actions were protected under the law.

3. WMATA then retaliated against him by denying him overtime opportunities, falsely accusing him of inappropriate conduct with written reprimands and threats, and generally treating him in a hostile and confrontational fashion. These actions were retaliatory and are

separately actionable, and have inflicted enormous stress, exacerbated medical conditions and required Plaintiff to take leave from work. This too violated Title VII.

## Jurisdiction and Venue

4. This is an action under Title VII of the Civil Rights Act of 1964 challenging WMATA's decision not to promote Plaintiff to positions he was best-qualified to assume, and retaliation after he complained about such unlawful treatment. This Court has jurisdiction under 42 U.S.C. §§ 2000e-5(f)(3). Venue lies in this Court as Plaintiff was assigned to work in this District and the discriminatory and retaliatory employment practices challenged in this action took place in this District.

## Parties

5. Plaintiff, Alphonza "Carl" Kirksey, is a current employee of WMATA. He was born in the United States, is Black and not of Caribbean descent.

6. Defendant, WMATA, is an entity created by interstate compact among Maryland, Virginia and the District of Columbia, and operates transit services in the greater DMV area. It is an employer subject to Title VII and employs more than 500 employees.

## Facts

### Denied Promotions Based on Discrimination

7. In August 2021, Plaintiff learned that WMATA had appointed Rayan Dunkley (a coworker of Plaintiff of Caribbean descent) to serve as the 6k coupler manager. The following day, Plaintiff asked Brand Loney (a manager who was involved in that assignment) how it came about that Mr. Dunkley was appointed to the role and why he (Plaintiff) was not considered, as Plaintiff had previously expressed interest in such opportunities. Plaintiff had been supervising the coupler shop for the past four years and had extensive experience interacting with federal and

local agencies involved in "uncoupling" investigations, such as the National Transportation Safety Board NTSB and Washington Metro Safety Commission (WMSC) and other stakeholders from the private sector. Mr. Loney responded to Plaintiff's inquiry by saying, "Oh Mr. Kirksey don't worry about it, it's only an assignment and it's temporary." Plaintiff replied that he believed that he was better qualified for the assignment because of his vast experience with WMATA in general and direct experience in the coupler shop, whereas Mr. Dunkley never worked in the coupler shop and had no experience and no expertise with coupler issues. Notwithstanding this, Rayan Dunklay was given the assignment.

8. WMATA then posted a formal vacancy announcement for a Quality Compliance Engineer position in December 2021, and reposted it in February 2022. Plaintiff was interviewed for the position the first time it was posted, and informed that he had performed very well. WMATA then canceled that posting and the selection process for it, and reposted the position in February 2022.

9. The position would have been a promotion for Plaintiff. He applied for the position and was exceedingly well-qualified for it. Indeed, all of the "oversight areas" related to this position were in departments that he had either supervised or worked-in, and he had the requisite knowledge and experience relating to all aspects of the job. This included:

- Supervisor of the Pneudraulic shop, Pneumatic shop, Coupler shop, Compressor shop, Component shop, and HVAC shop
- Car Maintenance positions: Service and Inspection Technician, Periodic Inspection Technician, Leadman and Acting Supervisor
- Deep familiarity with all the relevant standard operating procedures and overhaul procedures of all said departments
- Principally responsible for the quality overhauling of all major sub-components of the railcars and performing quality audits of those components

- Car Maintenance (CMNT) experience across the various (CMNT) shops, involving automated logic and one of the first technicians to work on and familiarize the team on the 7000 series railcar and with the awareness and planning efforts for the forthcoming 8000 series railcar. Notably, he was one of the first technicians to work on and become familiar with the new 7000 series

- Participate in meetings and investigation on behalf of WMATA with the WMSC, which is the oversight commission, to determine root causes of incidents. auditing parts or procedures, and assisting in developing corrective action plans for WMATA development and implementation.

- Maryland state general contractor license: providing safe, viable solutions — *based on root cause analysis* — to customer's infrastructure need or request, dealing with contractors and monitoring their performance, reading building plans, preparing or reviewing contracts, defining or working from scope of work and ensuring compliance with local and/or state jurisdiction

- Electrician: reading/utilizing engineering documents including diagrams and blueprints/plans, installing/maintaining/repairing electrical control, wiring, and lighting systems, troubleshooting *(root/cause)* electrical issues using appropriate testing devices, and documenting repairs and modifications.

10. Plaintiff had earned strong performance evaluations in his then-current assignment, which praised his knowledge and skill as a supervisor.

11. WMATA did not interview Plaintiff for the job, notwithstanding his excellent qualifications.

12. WMATA selected three applicants for the job. One of them was Rayan Dunkley, who had virtually no experience or background which would make him objectively well-suited for the position.

13. Earl Harper, who is of Caribbean descent, was one of the WMATA officials responsible for selecting Mr. Dunklay to this position.

14. Plaintiff was demonstrably better qualified than Mr. Dunklay in all objective qualifications for the job.

15. WMATA selected Mr. Dunklay instead of Plaintiff for this Quality Compliance Engineer position, because of national origin discrimination.

16. In the Fall 2021, WMATA posted a vacancy announcement for a Quality Compliance Officer position, which was responsible for the daily quality control/quality assurance activities related to all phases of Chief Mechanical Officer Rail operations and reporting to the Quality Compliance Manager.

17. Plaintiff applied for the position.

18. Plaintiff was again very well-qualified for this job, for the same reasons as described in ¶ 9, above.

19. WMATA did not afford Plaintiff an interview for this position.

20. When one of the HR talent acquisition officers learned that Plaintiff was not being interviewed, he spoke with Howard Gopie, the hiring manager, about interviewing Plaintiff because the talent acquisition officer knew that the Plaintiff was well-qualified for the job. Mr. Gopie responded by refusing, explaining only that he "didn't want to interview him" (i.e., Plaintiff). The talent acquisition officer relayed this information to Plaintiff. Mr. Gopie did not contend that Plaintiff lacked any necessary qualification for the job.

21. Mr. Gopie is of Caribbean descent.

22. Instead of Plaintiff, WMATA selected Yolanda Merchant for this position. Ms. Merchant is of Caribbean descent.

23. Ms. Merchant had little relevant experience or expertise for the job. Plaintiff was demonstrably better qualified than Ms. Merchant in all objective qualifications for the job.

24. WMATA selected Ms. Merchant instead of Plaintiff for this position, because of national origin discrimination.

25. On January 26, 2022, WMATA announced that it had non-competitively assigned Garfield Reid into a position as an LS 9 Shift Supervisor. This position became vacant upon the

death of another employee, and WMATA decided to fill it without competition.

26. Plaintiff had previously expressed interest in Shift Supervisor positions, and his managers knew of that interest by the time that this position opened. This position would have been a promotion for Plaintiff. Plaintiff was extremely well-qualified for this role, for all of the reasons set forth in ¶ 9, above.

27. Mr. Reid is of Caribbean descent.

28. Warren Thomas, the WMATA manager who assigned Mr. Reid to the position, is also of Caribbean descent. Moreover, Senior manager Earl Harper, who is also of Caribbean descent, has significantly contributed to Mr. Reid's career advancement despite his lack of experience in the areas for which he was promoted.

29. Mr. Thomas himself had only recently joined the department and had little knowledge or experience with the staff who would be available to fill this role.

30. Plaintiff was demonstrably better qualified than Mr. Reid in all objective qualifications for the job.

31. WMATA selected Mr. Reid instead of Plaintiff for this position, because of national origin discrimination.

32. WMATA then selected Mr. Reid to a higher level position – Assistant Superintendent – which Plaintiff also applied and interviewed for, but was not selected. Plaintiff was also extremely well-qualified for this position, for the reasons set forth in ¶ 9, above. The promotion of Mr. Reid took place within a year of his selection to the LS 9 Shift Supervisor position, an action which, upon information and belief, violated WMATA policy and practice. WMATA selected Mr. Reid instead of Plaintiff for this Assistant Superintendent position, because of national origin discrimination.

**Retaliation**

33. Plaintiff voiced concerns to the managers involved in these promotion denials that he believed he was not given fair consideration for the positions, because they were favoring employees who were of Caribbean descent. Plaintiff made it clear through these informal communications that he felt he had been subjected to discrimination. WMATA also has an Office of Civil Rights and on February 15, 2022 Plaintiff filed a written complaint of discrimination with that Office. Each of these methods of communication were "protected activity" under the law.

34. Plaintiff also engaged in protected activity by filing an official charge of discrimination with the U.S. Equal Employment Opportunity Commission in Washington, DC, in which he again complained about race and national origin discrimination.

35. WMATA has engaged in a series of retaliatory actions since learning about Plaintiff's protected activity.

36. For example, on February 16, 2022 a peer supervisor asked Plaintiff to cover his shift for him, and Plaintiff agreed to take that shift. This was then approved by management on March 4, 2022. But when Plaintiff appeared for the shift in question, Superintendent Warren Thomas instructed Plaintiff to follow him to his office and in aggressive tone told him that he was no longer needed to cover the shift, and to "pack your things" and move to the upstairs floor as "you are not supervising this shift." Mr. Thomas gave no explanation for why Plaintiff was being denied this shift, which would have afforded him overtime pay opportunity.

37. Similarly, on February 22, 2022 a senior manager, Earl Harper, asked Plaintiff to cover a shift at Shady Grove the following morning. Plaintiff was working until 11:30 p.m., on that day, but agreed to cover the shift to support his manager's request. This required Plaintiff to

be at Shady Grove by 5:30 a.m., and he arrived at that time and performed for the shift. He then reported back to his regular assigned shift (after completing the Shady Grove shift) which would have resulted in overtime compensation for the day. At that point, Plaintiff was informed by managers Warren Thomas and Kevin Mack to go home, and that he would not be allowed to work his regular shift because of his early morning coverage as requested by Mr. Harper. This action was contrary to WMATA practice and policy, and taken to deprive Plaintiff of the overtime opportunity. Other supervisors had regularly been permitted by these same managers to cover two shifts, and paid overtime compensation when that occurred.

38. Plaintiff was likewise denied the opportunity to cover shifts for a planned vacation for colleague Bryan Gibson. No other employee was willing to provide the coverage or had responded and Mr. Gibson notified management that Plaintiff would cover for him. Warren Thomas then intervened (again contrary to regular practice) and refused just one work day before the shift. He instructed Gibson to find someone else to cover the shift. There was no legitimate basis for this action, and it was merely done to harass and retaliate against Plaintiff.

39. WMATA managers have also taken other retaliatory actions, including issuing an unjustified written reprimand, evicting him from a secured office and placing him in an unsecured work space in the middle of the workshop, arbitrarily removing employees from under his leadership, and generally treating Plaintiff with hostility.

40. Defendant's actions, as set forth above, have damaged Plaintiff's career and reputation and caused him significant emotional distress, anxiety, pain, humiliation, and loss of enjoyment of life, and harmed his health. They have also caused pecuniary losses.

**<u>Exhaustion of Administrative Remedies</u>**

41. Plaintiff timely filed a charge of discrimination with the Equal Employment

Opportunity Commission and has filed this lawsuit within the 90-day notice period after receiving the Commission's Notice of Right to Sue. All of the prerequisites to suit have been satisfied.

## VIOLATIONS OF LAW

## COUNT ONE

**(Race, Ethnicity & National Origin Discrimination)**

42. Defendant's actions in refusing to select Plaintiff for any of the positions described above because of his national origin, ethnicity and/or race violated Title VII of the Civil Rights Act of 1964, as amended.

## COUNT TWO

**(Retaliation)**

43. Defendant's actions in denying him overtime opportunities, threatening and disciplining him because of his protected EEO activity was retaliatory and violated Title VII of the Civil Rights Act of 1964.

## Relief Sought

Plaintiff asks the Court to grant him the following relief:

1. Declare that Defendant's actions as set forth above violated Plaintiff's rights under Title VII;

2. Order Defendant to instate Plaintiff into one of the promotional opportunities he was denied unlawfully, or into a comparable position at that same grade level and pay, retroactive to the date of his unlawful denial of the job, and pay Plaintiff all back pay and benefits, with pre-judgment interest, retroactive to the date of the discrimination and/or retaliation.

3. Award Plaintiff compensatory damages for the pain, suffering, loss of enjoyment of

life, and other injuries Defendant's actions have caused, in an amount to be proven at trial;

4. Order Defendant to cease and desist from all future discrimination and retaliation against Plaintiff;

5. Order Defendant to pay Plaintiff's costs, including reasonable attorney fees and any other costs allowed by law, for this action and for the administrative proceedings which he was required to exhaust before bringing this action;

6. Award prejudgment interest as allowed by law;

7. Maintain jurisdiction over this matter until such time as all remedial action has been taken by the Defendant;

8. Order such other and additional relief as the Court deems just and equitable.

**Jury Demand**

Plaintiff demands trial by jury.

/s/

Richard A. Salzman 422497
HELLER, HURON, CHERTKOF
& SALZMAN
1010 Wayne Ave., Suite 510
Silver Spring, MD 20910
(202) 293-8090

Attorneys for Plaintiff